1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No. 2:11-cr-449-KJM

12              Plaintiff,

13        v.                                ORDER

14   BRIAN JUSTIN PICKARD, et al.,

15              Defendants.

16

17

18              It has been forty-five years since Congress passed the Controlled Substances Act,

19   including marijuana in Schedule I.  Defendants say the law as passed can no longer stand.  The

20   government says that is not for this court to decide.  To say the landscape with respect to

21   marijuana has changed significantly since 1970, in many ways, is an understatement.  While the

22   court is not blind to the practical context in which it operates, its duty as a resident of the third

23   branch of our republican form of government is to resolve the legal questions presented by the

24   parties, fairly and evenly, not as a maker of public policy.  The court fulfills this duty without

25   respect to who is arguing what position, or what the newspapers, blogs and commentators say; it

26   does so while putting aside preconceptions and dispositions, likes and dislikes, bias and prejudice.

27   Because defendants' motion challenges a decision made by Congress, which is the first,

28

1   representative branch of government, the court treads lightly as it is required to do.  In performing

2   its duty the court takes the factual record as the parties have developed it through the introduction

3   of documentary evidence and, in this case, an evidentiary hearing.  Having approached

4   defendants' constitutional challenges to marijuana's Schedule I status with an open mind, the

5   court had to be prepared to grant their motion to dismiss if the law and facts supported that

6   decision.  At some point in time, in some court, the record may support granting such a motion.

7   But having carefully considered the facts and the law as relevant to this case, the court concludes

8   that on the record in this case, this is not the court and this is not the time.

9   I.      BACKGROUND

10          The motion before the court was brought originally by defendant Brian Justin

11  Pickard; he moves to dismiss the government's indictment.  (ECF No. 199.)  The remaining

12  defendants join in the motion.  Defendants argue the indictment must be dismissed because the

13  classification of marijuana[1] as a Schedule I substance under the Controlled Substances Act (CSA)

14  is unconstitutional.  For the reasons set forth below, the court DENIES the motion.

15          On October 20, 2011, sixteen individuals were indicted for conspiracy to

16  manufacture at least 1,000 marijuana plants, in violation of 21 U.S.C. §§ 846, 841(a)(1).

17  (Indictment, ECF No. 30.)  On November 20, 2013, Mr. Pickard moved to dismiss the indictment,

18  arguing that the classification of marijuana as a Schedule I substance under the CSA, 21 U.S.C.

19  § 801, *et seq.*, violates his Fifth Amendment equal protection rights and that the government's

20  allegedly disparate enforcement of the federal marijuana laws violates the doctrine of equal

21  sovereignty of the states under the Tenth Amendment.  (ECF No. 199 at 2–3.)  In the same

22  motion, defendant requested that this court hold an evidentiary hearing to take testimony on

23  defendant's constitutional challenges.  (*Id.* at 3.)  The other defendants[2] joined in the motion.

24  ─────────────────

25          [1] While defendants in their original motion also challenged the classification of
    tetrahydrocannabinol (THC) as a Schedule I substance, the parties' subsequent briefing has
26  focused on marijuana's classification, with only passing references to THC.

27          [2] The following defendants subsequently entered into plea agreements and have been
    sentenced: Homero Lopez-Barron, Victorino Betancourt-Meraz, Oseas Cardenas-Tolentino,
28  Fernando Reyes-Mojica, Juan Cisneros-Vargas, Filiberto Espinoza-Tapia, and Osiel Valencia-

2

1  (*See* ECF No. 256.)  The government opposed defendants' motion (ECF No. 224), and defendants

2  replied (ECF No. 233).

3      On March 25, 2014, the court granted defendants' request for an evidentiary

4  hearing.  (ECF No. 262).  The evidentiary hearing occupied five days between October 24, 2014

5  (ECF No. 347) and October 30, 2014 (ECF No. 351).  During the evidentiary hearing, the court

6  heard testimony from Gregory T. Carter, M.D., Carl L. Hart, Ph.D., Philip A. Denney, M.D.,

7  Christopher Conrad, and Bertha K. Madras, Ph.D. (*See* ECF Nos. 347-350).  After the evidentiary

8  hearing, the court set a post-evidentiary hearing briefing schedule and a date for closing

9  arguments.  (ECF Nos. 359, 371.)  The government filed its post-evidentiary hearing brief on

10  December 31, 2014 (ECF No. 374), and defendants filed theirs on January 5, 2015 (ECF No.

11  378).  The parties replied on January 21, 2015.  (ECF Nos. 381, 382.)  The parties presented their

12  closing arguments on February 11, 2015, after which the court submitted the motion (ECF No.

13  386).

14      In addition, on February 6, 2015, defendants filed a request for judicial notice,

15  asking that the court take notice of (1) certain statements made by the United States Surgeon

16  General on February 4, 2015, and (2) the introduction of H.R. 5762, the Veterans Equal Access

17  Act of 2014, in the House of Representatives on November 20, 2014.  (ECF No. 385 at 8–9.)  The

18  court takes judicial notice of the fact that the U.S. Surgeon General, during a televised interview

19  on "CBS This Morning" on February 4, 2015, made a statement about marijuana's efficacy for

20  some medical conditions and symptoms.  Fed. R. Evid. 201; *see Davis v. Granger*, No. 12-1746,

21  2014 WL 3797966, at *5 (W.D. La. Aug. 1, 2014) (taking judicial notice of a report by the

22  Surgeon General).  However, the court declines to take judicial notice of H.R. 5762, as it does not

23  have the force of law.  *See Davis v. United States*, 569 F. Supp. 2d 91, 98 (D.D.C. 2008)

24  (declining to take judicial notice of a proposed bill because it does not carry the force of law and

25  hence, is irrelevant).

26

27  Alvarez.  The remaining defendants are: Bryan R. Schweder, Paul Rockwell, Juan Madrigal
    Olivera, Manuel Madrigal Olivera, Fred W. Holmes, Effren A. Rodriguez, Rafael Camacho-
28  Reyes, Leonardo Tapia, and Brian J. Pickard.

1    Defendant also asked the court to consider a new piece of evidence identified as

2  exhibit AAA, a study published on January 28, 2015, which defendant argues "directly refutes the

3  methods and findings" of government exhibit 209. (*Id.* at 9–10.)  The court grants that request

4  under the rule of completeness. *See United States v. Castro-Cabrera*, 534 F. Supp. 2d 1156,

5  1160–61 (C.D. Cal. 2008) (citing Fed. R. Evid. 106).  Government exhibit 209 is a study

6  published in the *Journal of Neuroscience* in April 2014.  That study, titled "Cannabis Use is

7  Quantitatively Associated with Nucleus Accumbens and Amygdala Abnormalities in Young

8  Adult Recreational Users," concludes that marijuana exposure is associated with brain changes.

9  (*See* Gov't Ex. 209.)  Exhibit AAA is also a study published in the *Journal of Neuroscience*, in

10  January 2015.  (ECF No. 385-3.)  The study, titled "Daily Marijuana Use is not associated with

11  Brain Morphometric Measures in Adolescents or Adults," concludes otherwise.  The latter study

12  cites the former study and argues it was erroneous.  It is fair to allow exhibit AAA into evidence,

13  for what it is worth.

14  II.    <u>LEGAL STANDARD ON A MOTION TO DISMISS</u>

15    Under Federal Rule of Criminal Procedure 12(b), "[a] party may raise by pretrial

16  motion any defense, objection, or request that the court can determine without a trial on the

17  merits."  There is no prohibition against the consideration of extrinsic evidence for purposes of a

18  Rule 12(b) motion to dismiss.  Rule 12(b) "permits factual hearings prior to trial if necessary to

19  resolve issues of fact peculiar to the motion."  *United States v. Covington*, 395 U.S. 57, 60 (1969).

20  Here, the court determined a hearing was necessary to resolve issues of fact relating to

21  defendants' motion to dismiss the indictment.  (ECF No. 256.)

22    "[A] district court may make preliminary findings of fact necessary to decide the

23  questions of law presented by pre-trial motions so long as the court's findings on the motion do

24  not invade the province of the ultimate finder of fact."  *United States v. Shortt Accountancy*

25  *Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (quoting *United States v. Jones*, 542 F.2d 661, 664

26  (6th Cir. 1976), *cert. denied,* 478 U.S. 1007 (1986)).  "The District Court [is] not limited to the

27  face of the indictment in ruling on the motion to dismiss."  *Jones*, 542 F.2d at 665.  To the extent

28  the court makes findings below, they are necessary to resolution of defendants' motion to dismiss.

1    III.    JURISDICTIONAL CONSIDERATIONS

2         A.    Standing

3              1.    The Parties' Arguments

4              The government contends defendants lack standing to argue that "the continued

5    inclusion of marijuana as a Schedule I controlled substance in Title 21 of the federal statutes

6    passes constitutional muster" (ECF No. 271 at 3), because "neither their criminal liability nor

7    their eventual criminal sentence depend on marijuana's status as a Schedule I substance" (ECF

8    No. 279 at 1).  The government points out that defendants are charged with violating 21 U.S.C.

9    § 841(a), which applies to any controlled substance; thus, it says "their charges are not dependent

10   upon marijuana's status as a Schedule I substance."  (*Id.* at 1.)  The government argues that the

11   sentences provided for in the statute "apply regardless of whether marijuana is on Schedule I" as

12   long as "marijuana is treated as a controlled substance *at all*."  (*Id.* at 1–2) (emphasis in original).

13   "Put plainly, a decision holding that it is unconstitutional for marijuana to be treated as a

14   Schedule I substance will have no impact on whether [d]efendants go to jail or for how long."

15   (*Id.* at 2.)

16              Defendants counter that they are "not petitioning this [c]ourt to *reschedule*

17   marijuana, but rather [are] contesting the constitutionality of [21 U.S.C. § 812(c)(10), (17)], the

18   *Congressional Act* which classifies marijuana as a Schedule I [c]ontrolled [s]ubstance.  Should

19   the defense prevail, these statutory provisions are deemed invalid, and thus marijuana and THC

20   would be removed from the CSA, *not* simply replaced within the Schedule.  In effect, no

21   controlled substance could be identified to support a prosecution under *21 U.S.C. [§] 841(a)*."

22   (ECF No. 287 at 2 n.1 (emphases in original).)

23              2.    Legal Standards

24              Article III of the Constitution limits the jurisdiction of federal courts to "cases"

25   and "controversies."  *See, e.g.*, *Clapper v. Amnesty Int'l*, ___ U.S. ___, 133 S. Ct. 1138, 1146

26   (2013).  As the Supreme Court has observed, "[n]o principle is more fundamental to the

27   judiciary's proper role in our system of government than the constitutional limitation of federal-

28   court jurisdiction to actual cases or controversies."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S.

332, 341 (2006) (internal quotation marks omitted).  The party invoking federal jurisdiction has

the burden of establishing constitutional standing.  *Clapper*, 133 S. Ct. at 1146; *see also Bond v.*

*United States*, ___ U.S. ___, 131 S. Ct. 2355, 2361 (2011) (citing *Lujan v. Defenders of Wildlife*,

504 U.S. 555 (1992)).  To establish Article III standing, a party must show an injury that is "[(1)]

concrete, particularized, and actual or imminent; [(2)] fairly traceable to the challenged action;

and [(3)] redressable by a favorable ruling."  *Clapper*, 133 S. Ct. at 1147 (internal quotation

marks omitted).  "[This] irreducible constitutional minimum" requires that the party suffer "an

invasion of a legally protected interest . . . ."  *Lujan*, 504 U.S. at 560.

               3.        Analysis

         Here, defendants have established Article III standing.  Defendants are charged

with conspiracy, 21 U.S.C. § 846, to manufacture marijuana, a controlled substance, *id.*

§ 841(a)(1).  (ECF No. 30.)  The indictment specifies defendants allegedly conspired to

manufacture at least 1,000 marijuana plants on private property.  (*Id.* at 2–4.)[3]  Section 846

punishes "[a]ny person who . . . conspires to commit any offense defined in this subchapter" with

"the same penalties as those prescribed for the offense, the commission of which was the object

of the . . . conspiracy."  21 U.S.C. § 846.  Section 841 makes it unlawful "to manufacture . . . a

controlled substance."  *Id.* § 841(a)(1).  In turn, § 812(c) lists "Marihuana" and

"Tetrahydrocannabinols" as Schedule I controlled substances.  21 U.S.C. § 812(c)(10), (17).  If

defendants are convicted, their sentences will be calculated based on marijuana's Schedule I

status.  *See* 21 U.S.C. §§ 841, 846.

         Defendants have shown concrete and imminent injury: incarceration as a result of

their charged violations of the CSA, if they are convicted.  *See Spencer v. Kemna*, 523 U.S. 1, 7–8

(1998).  Defendants have also shown that inclusion of marijuana as a Schedule I controlled

---

[3] Certain of the government's questions during the evidentiary hearing strongly suggested the government understands that defendants were engaged in growing marijuana for sale to medical marijuana dispensaries.  (*See* Conrad Test. 537:18–539:10, 547:21–548:8, 550:13–553:13, 557:5–13; ECF No. 365.)  In closing arguments the government denied it conceded this point.  (ECF No. 386.)  While the defense appeared confused by the government's position in this respect, the court need not make a determination regarding the purpose for which defendants were growing marijuana as their purpose is immaterial to the court's analysis of the motion to dismiss.

1    substance is the cause of their injury.  If this court were to find that Congress acted

2    unconstitutionally in placing marijuana on Schedule I, marijuana would no longer be considered a

3    controlled substance because it is classified as a controlled substance only under Schedule I and

4    not under any other schedule.  Stated simply, if marijuana were absent from that schedule,

5    defendants could not be charged with violation of sections 841(a), and 846 and the sentences

6    provided for in sections 841 and 844 would not apply.

7            As to the redressability element of standing, defendants must show that it is

8    "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable

9    decision.'"  *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*,

10   426 U.S. 26, 38, 43 (1976)).  "In deciding whether a [party's] injury is redressable, courts assume

11   that [a party's] claim has legal merit."  *Bonnichsen v. United States*, 367 F.3d 864, 873 (9th Cir.

12   2004).  Defendants have met their burden under *Lujan* to show that invalidating the statute at

13   issue would redress their injury.  If defendants receive a favorable ruling, finding the statutory

14   classification of marijuana violative of the Constitution, the court would, in effect, decriminalize

15   marijuana.  Consequently, defendants' charge of conspiracy to manufacture marijuana, a

16   controlled substance, would be dismissed.  *See Ex parte Siebold*, 100 U.S. 371, 376–77 (1879) (a

17   conviction under an unconstitutional law is illegal and void, "and cannot be a legal cause of

18   imprisonment").  It is therefore likely the injury suffered by defendants would be redressed by a

19   favorable decision.

20           Having established (1) injury-in-fact, (2) causation, and (3) redressiblity,

21   defendants have sufficient Article III standing to raise a constitutional challenge to the inclusion

22   of marijuana as a Schedule I substance under 21 U.S.C. § 812(b)(1).

23           The government's citation to three cases does not alter this conclusion.  The cases

24   are *United States v. Osburn*, 175 F. App'x 789 (9th Cir. 2006); *United States v. McWilliams*,

25   138 F. App'x 1 (9th Cir. 2005); and *United States v. Tat*, No. 12-81, 2014 WL 1646943 (W.D.

26   Pa. Apr. 24, 2014).  As an initial matter, the court notes that both *Osburn* and *McWilliams* are

27   unpublished memoranda dispositions issued before January 1, 2007.  Accordingly, those

28   decisions have no precedential value, *see* CTA9 Rule 36-3 ("Unpublished dispositions and orders

1   of [the Ninth Circuit] are not precedent . . . ."), and are not citable to a court in this circuit, *see id.*

2   ("Unpublished dispositions and orders of [the Ninth Circuit] issued before January 1, 2007 may

3   not be cited to the courts of this circuit . . . ."); Fed. R. App. P. 32.1.  Even assuming they have

4   some persuasive value, they are distinguishable.

5          In *McWilliams*, the defendant apparently was producing marijuana for intrastate

6   medical purposes, in compliance with California's Compassionate Use Act, Cal. Health & Safety

7   Code § 11362.5.  138 Fed. App'x at *2.  He pled guilty to manufacturing marijuana and then

8   appealed the district court's denial of his motion to dismiss the indictment, apparently arguing,

9   among other things, for reclassification: "the classification of marijuana as a 'Schedule I'

10  controlled substance, rather than in a less restrictive classification, is 'irrational . . . .'"

11  138 F.App'x at 2.  The appellate disposition concludes that McWilliams did not have standing

12  because "[a]nyone who manufactures *any* controlled substance, must, to avoid conviction for

13  illegal manufacture, obtain an annual registration from the Attorney General . . . something

14  McWilliams did not do."  *Id.* (emphasis in original, internal citation omitted).

15         In *Osburn*, in finding defendants did not have standing to bring an equal protection

16  challenge to the indictment, the panel phrased the question before it as a rescheduling of

17  marijuana, which is not the question before this court.  175 F. App'x at 790.

18         *Tat* is citable but is a decision by a sister district court outside of the Ninth Circuit,

19  the Western District of Pennsylvania,[4] and is at most persuasive authority.  *See Burton v. Time*

20  *Warner Cable Inc.*, No. 12-06764, 2013 WL 3337784, at *7 n.1 (C.D. Cal. Mar. 20, 2013).  In

21  *Tat*, the defendant was charged with a single count of conspiracy to distribute marijuana.  *Tat*,

22  2014 WL 1646943, at *1.  The defendant moved to dismiss the indictment, arguing, *inter alia*,

23  "the charge should be dismissed because marijuana is allegedly no longer properly classified as a

24  Schedule I controlled substance and enforcement of the same violates his rights under the Due

25  Process Clause of the Fifth Amendment."  *Id.* at *3.  To support his argument, the defendant

26

27         [4]  Rule 28.3 of the Third Circuit's local appellate rules, states: "Citations to federal
    decisions that have not been formally reported must identify the court, docket number and date,
28  and refer to the electronically transmitted decision."

8

1   referenced changes in other states' laws, which legalized the sale of marijuana for personal and

2   medicinal purposes, although he did not demonstrate his compliance with any state law.  *Id*. at *3,

3   5.  In denying the defendant's motion, the court in *Tat* reached essentially the same conclusion as

4   did the Ninth Circuit panel in the unpublished *McWilliams* disposition: "a criminal defendant who

5   has not sought authorization from the Attorney General prior to manufacturing or distributing a

6   Schedule I controlled substance lacks standing to challenge a drug's classification in Schedule

7   I . . . because reclassification is clearly a task for the legislature and the attorney general and not a

8   judicial one . . . ."  *Id.* at *4 (internal citation and quotation marks omitted).

9            *Tat* is distinguishable.  Unlike the defendant in *Tat*, who brought a due process

10  challenge, defendants here challenge the classification of marijuana as violative of their equal

11  protection rights under the Fifth Amendment.  Further, in *Tat*, the defendant's argument was

12  based on changes in state laws only; the defendant did not argue that marijuana should be

13  decriminalized, as defendants argue in this case.  Moreover, to the extent the government cites

14  *Tat* for the general proposition that a criminal defendant never has standing to raise a

15  constitutional challenge to a controlled substance's classification unless that person has sought

16  prior authorization from the Attorney General, this court finds that proposition unsupported by

17  precedent and the argument unpersuasive.  As the Second Circuit observed in a case considering

18  the constitutionality of marijuana's classification more than thirty years ago, the Attorney General

19  "does not have the power to declare the [CSA] unconstitutional."  *United States v. Kiffer*, 477

20  F.2d 349, 351 (2d Cir. 1973).  Most importantly, "even assuming the existence of a viable

21  administrative remedy, application of the exhaustion doctrine to criminal cases is generally not

22  favored because of 'the severe burden' it imposes on defendants."  *Id.* at 352.  This court declines

23  to place the heavy burden of exhaustion on the defendants in this case.

24            Many cases have proceeded to consider the merits of the same or similar

25  arguments made by defendants in this case.  *See, e.g.*, *United States v. Fogarty*, 692 F.2d 542,

26  547–48 (8th Cir. 1982); *United States v. Wilde*, No. 12-0144, ___ F. Supp. 3d ___, ___, 2014

27  WL 6469024, at *1–5 (N.D. Cal. Nov. 18, 2014); *United States v. Heying*, No. 14-30, 2014 WL

28  5286153, at *1–10 (D. Minn. Aug. 15, 2014).  These cases are consistent with this court's

1    finding, and none of the government's cases undercuts the finding that defendants have

2    established Article III standing to challenge the constitutionality of the inclusion of marijuana in

3    Schedule I of the CSA.

4           B.       Jurisdiction

5                    1.       The Parties' Arguments

6                    In its February 13, 2014 opposition to defendants' motion to dismiss the

7    indictment, the government argued this court had no jurisdiction to hear defendants' arguments,

8    in light of the provisions of 21 U.S.C. section 877.  (ECF No. 224 at 8–10.)  Defendants reply

9    section 877 "by its terms applies to judicial review of administrative action, not Congressional

10   Acts."  (ECF No. 233 at 7–9.)

11                   During a hearing in March 2014, the court heard argument on the question of

12   subject matter jurisdiction and ruled it had jurisdiction, noting it would remain alert to that

13   question as the case proceeded, in the event its initial determination required reconsideration.

14   (ECF No. 258 at 10.)  At hearing, defendants stated their position as follows:

15           We're not asking for reclassification. We're asking that the statute
             be struck because it is unconstitutional at this particular day and this
16           particular time in the history of the evolution of the evidence with
             regard to the effects of marijuana.
17

18   (*Id.* at 9.)  Defendants have not wavered from this positon.  (*See, e.g.,* ECF No. 287 at 2 n.1; ECF

19   No. 382 at 43–44.)

20                   Later in March 2014, the government sought reconsideration of the court's order

21   granting an evidentiary hearing, stating that it "initially opposed the defendants' motion to

22   dismiss the indictment on the grounds that the [c]ourt lacks jurisdiction to consider any challenge

23   to the scheduling of marijuana" but it now accepts the court's determination "that jurisdiction is

24   proper."  (ECF No. 264 at 3–4 (citing *United States v. Moreno-Morillo*, 334 F.3d 819 (9th Cir.

25   2003)).)  The government sought reconsideration of the grant of a hearing, arguing in part that

26   "there is no occasion for an evidentiary hearing or a fresh examination of the equal protection

27   challenge, as the Ninth Circuit has already decided the issue."  (ECF No. 264 at 4 (citing *United

28   States v. Miroyan*, 577 F.2d 489, 495 (9th Cir. 1978)).)

1    During the April 2014 hearing on the government's motion for reconsideration, the

2    court confirmed the government conceded jurisdiction. (ECF No. 275 at 8; *see also* ECF No. 271

3    at 2 ("The government now concedes the court has jurisdiction to entertain the defense

4    motion . . . .").) The court explained it did not "think the [g]overnment has satisfied its burden of

5    showing the [c]ourt should reconsider" its prior decision; it further explained the grant of a

6    hearing because it "believe[s] there is a question raised about the statutory listing of marijuana as

7    a Schedule I drug in light of the three factors [under 21 U.S.C. § 812(b)(1)(A)–(C)], applicable to

8    maintaining that substance on the list." (ECF No. 275 at 8–9.)

9    In May 2014, the government renewed its section 877 argument. (ECF No. 279.)

10   The government explained that while it previously accepted the court's jurisdiction to consider

11   any challenge to the statute's constitutionality (ECF No. 264), the court's clarification that it is

12   considering a challenge to maintaining marijuana as a Schedule I controlled substance provided a

13   basis for a new argument. (ECF No. 279 at 9.) The government argued 21 U.S.C. section 877

14   deprives the court of jurisdiction to entertain "whether the continued inclusion of marijuana as a

15   Schedule I controlled substance . . . passes constitutional muster," (ECF No. 271 at 3), because

16   "the agencies assigned by Congress to make such scheduling determinations have decided not to

17   re-schedule or de-schedule it." (ECF No. 279 at 11–12.) The government argues "[b]ecause

18   Congress provided that the exclusive forum for making such a challenge is in the Circuit Courts

19   after the administrative process, this [c]ourt lacks subject matter jurisdiction to consider or decide

20   the question in this criminal prosecution." (*Id.* at 12.) Defendants address the government's

21   renewed argument briefly in their reply brief, arguing the court has already decided the issue.

22   (ECF No. 287 at 2 n.1.)

23          2.      Statutory Framework

24   The CSA, enacted in 1970, organizes substances into five schedules based on

25   certain factors. *See* 21 U.S.C. § 812(b). The criteria concern current medical uses, potential for

26   abuse, and possible physical or psychological dependency effects. *See id.* Schedule I is at the

27   high end and lists substances including heroin, morphine, peyote, and marijuana. *Id.* Sch. I

28   (b)(10), (14)–(16); (c)(10), (12). Schedule V is at the low end, and includes any compound

1    containing not more than 200 milligrams of codeine per 400 grams, among others.  *Id.*

2    § 812(b)(5).  "Unlike Schedule I drugs, federal law permits individuals to obtain Schedule II, III,

3    IV, or V drugs for personal medical use with a valid prescription."  *Americans for Safe Access v.*

4    *Drug Enforcement Admin.*, 706 F.3d 438, 441 (D.C. Cir. 2013).

5         The specific statutory findings required for Schedule I listing are as follows:

6         A.  The drug or other substance has a high potential for abuse.

7         B.  The drug or other substance has no currently accepted medical use in treatment

8              in the United States.

9         C.  There is a lack of accepted safety for use of the drug or other substance under

10             medical supervision.

11   *Id.* § 812(b)(1).

12        As noted, when the CSA was enacted, Congress classified marijuana as a Schedule

13   I controlled substance.  *See* 21 U.S.C. §§ 801, 812(b)(1).  It did so based, in part, on the

14   recommendation of the Secretary of Health, Education, and Welfare.  *See Gonzales v. Raich*, 545

15   U.S. 1, 14 n.22 (2005); *Nat'l Org. for Reform of Marijuana Laws (NORML) v. Bell*, 488 F. Supp.

16   123, 135 n.32 (D.D.C. 1980) (noting "[t]his recommendation came in a letter . . . ."); *Kiffer*, 477

17   F.2d at 356 (citing H.R. Report 91-1444.)  The CSA provides that the Attorney General may add,

18   remove, or transfer a substance to, from, or between schedules.  *See id.* § 811(a).  The law lists

19   various factors for the Attorney General to consider when making that determination.  *See id.*

20   § 811(b)–(c).  The CSA provides for a process by which parties aggrieved by a final decision of

21   the Attorney General may appeal the decision.  Under the CSA:

22

23        All final determinations, findings, and conclusions of the Attorney
          General under this subchapter shall be final and conclusive

24        decisions of the matters involved, except that any person aggrieved
          by a final decision of the Attorney General may obtain review of

25        the decision in the United States Court of Appeals for the District of
          Columbia or for the circuit in which his principal place of business

26        is located upon petition filed with the court and delivered to the
          Attorney General within thirty days after notice of the decision.

27        Findings of fact by the Attorney General, if supported by
          substantial evidence, shall be conclusive.

28   *Id.* § 877.

12

1    "Despite considerable efforts to reschedule marijuana" through the administrative

2    process, "it remains a Schedule I drug." *Gonzales v. Raich*, 545 U.S. 1, 15 n.23 (2005).

3                    3.      Analysis

4                            a.      Section 877 Generally

5                    The essence of the government's argument against jurisdiction is that section 877

6    bars the court from considering defendants' constitutional challenge to marijuana's scheduling.

7    (*See* ECF No. 279 at 12.)

8                    "Federal courts are courts of limited jurisdiction," possessing "only that power

9    authorized by Constitution and statute." *Gunn v. Minton*, ___ U.S. ___, 133 S. Ct. 1059, 1064

10   (2013) (internal quotation marks omitted).  This court has a duty to address the question of

11   jurisdiction before it can proceed to the merits.  *See Grupo Dataflux v. Atlas Global Grp., L.P.*,

12   541 U.S. 567, 593 (2004) (noting "by whatever route a case arrives in federal court, it is the

13   obligation of both district court and counsel to be alert to jurisdictional requirements").

14                   Here, the court finds it has jurisdiction to hear defendants' arguments.  Defendants

15   are not seeking reclassification of marijuana, nor have they filed an administrative petition with

16   the Attorney General for such reclassification with a decision pending.  Rather, defendants argue

17   21 U.S.C. section 812 violates the equal protection clause of the Fifth Amendment because

18   marijuana's classification as a Schedule I substance is arbitrary.  (ECF No. 199-1 at 11–12.)  A

19   constitutional challenge to the classification of a substance by Congress in a statute is not beyond

20   the jurisdiction of this court.  *See, e.g.*, *United States v. Rodriquez-Camacho*, 468 F.2d 1220,

21   1222 (9th Cir. 1972) (addressing a constitutional challenge to the regulation of marijuana and

22   holding "[i]t is sufficient that Congress had a rational basis for making its findings"); *Miroyan*,

23   577 F.2d at 495 (citing supporting case law and rejecting the argument that "[m]arijuana . . .

24   cannot rationally be deemed to meet the criteria required for a Schedule I controlled substance

25   [under the CSA]"); *Sacramento Nonprofit Collective v. Holder*, 552 F. App'x 680, 683 (9th Cir.

26   Jan. 15, 2014) (unpublished) (same); *Wilde*, 2014 WL 6469024, at *3–5 (addressing the merits of

27   a defendant's Fifth Amendment challenge to the classification of marijuana under the CSA).  And

28   while the Ninth Circuit has held that "substantive collateral attacks on permanent scheduling

1    orders are impermissible in criminal cases . . . ," *United States v. Forrester*, 616 F.3d 929, 937

2    (9th Cir. 2010), this is not an action where a party is attacking a permanent scheduling order

3    established by the Attorney General.  Instead, the court is faced with a constitutional challenge to

4    the statute that forms the basis for the charges in the indictment.  The court has jurisdiction to

5    hear that challenge.  *See, e.g.*, *Wilde*, 2014 WL 6469024, at *3–5; *United States v. Heying*

6    (*Heying I*), No. 14-30, 2014 WL 5286153, at *2 (D. Minn. Aug. 15, 2014) (finding subject matter

7    jurisdiction under similar circumstances).

8                        b.        The Statute is Not Insulated from Constitutional Review

9                A provision conferring jurisdiction to entertain such a challenge is not required to

10   be included in the CSA itself, nor is the statute insulated from constitutional review by

11   Congressional delegation of authority to an agency to consider an administrative petition.  *See*

12   *United States v. Emerson*, 846 F.2d 541, 544 (9th Cir. 1988) ("Construing a statute to preclude

13   constitutional review would 'raise serious questions concerning [its] constitutionality,' and

14   therefore, whenever possible, statutes should be interpreted as permitting such review." (quoting

15   *Johnson v. Robison*, 430 U.S. 361, 366–67 (1974))).  The government has not pointed to any

16   "clear and convincing" evidence that Congress intended to preclude review of constitutional

17   claims regarding the CSA.  *Emerson*, 854 F.2d at 544 (citing *Califano v. Sanders*, 413 U.S. 99

18   (1977)).  The government's analogy to the Tucker Act, 28 U.S.C. § 1491, which does not

19   expressly provide a court with jurisdiction to hear a challenge to the statute, is unavailing.

20               In performing the constitutional review requested here, this court is exercising one

21   of its essential duties.  *See Marbury v. Madison*, 5 U.S. 137, 177–80 (1803).  A federal court does

22   have the power, when required, "to declare Acts of Congress unconstitutional[,]" *United States v.*

23   *Raines*, 362 U.S. 17, 20 (1960), "the gravest and most delicate duty that [courts] [are] called on to

24   perform," *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.).  *Cf. Kiffer*, 477 F.2d at

25   351–52.  A court has that power even if, as here, it does not exercise it.

26               The court has jurisdiction to consider defendants' motion.

27   /////

28
                                              14

1    C.    Consideration of Defendants' Motion is Not Foreclosed By Binding Precedent

2    The government cites to the *Miroyan* case, decided in 1978, in arguing that Ninth

3    Circuit precedent forecloses "a fresh examination of the equal protection challenge, as the Ninth

4    Circuit has already decided the issue."  (ECF No. 264 at 4.)  While keenly aware of its duty to

5    follow binding precedent, the court is not persuaded by the government's argument here.  In

6    *Miroyan*, the defendants were "convicted of conspiracy to possess a controlled substance with

7    intent to distribute, importation of a controlled substance, and possession of a controlled

8    substance with intent to distribute."  577 F.2d at 492.  One of the defendants argued, among other

9    things, that marijuana "cannot rationally be deemed to meet the criteria required for a Schedule I

10   substance: high potential for abuse, no currently accepted medical use, and lack of accepted

11   safety under medical supervision."  *Id.* at 495.  In addressing that argument, the Ninth Circuit

12   held as follows:

13
             We need not again engage in the task of passing judgment on
14           Congress' legislative assessment of marijuana. As we recently
             declared, the constitutionality of the marijuana laws has been
15           settled adversely to [defendants] in this circuit.

16   *Miroyan*, 577 F.2d at 495 (quoting *United States v. Rogers*, 549 F.2d 107, 108 (9th Cir. 1976)).

17   *Miroyan* does not foreclose a court's consideration of future constitutional

18   challenges to the classification of marijuana as a Schedule I drug.  The case does not stand for the

19   proposition that even if defendants proffer credible evidence, raising serious questions regarding

20   the constitutional soundness of marijuana's listing on Schedule I, district courts cannot entertain a

21   constitutional challenge.

22   In *Rogers*, the case *Miroyan* quoted, the Ninth Circuit also did not foreclose

23   consideration of future constitutional challenges to marijuana's scheduling.  *See* 549 F.2d at 108.

24   *Rogers* merely cited *Rodriquez-Camacho*, 468 F.2d at 1222, and without further explanation,

25   noted that "[t]he constitutionality of marijuana laws has been settled adversely to the [defendants]

26   in this circuit."  *Id.*  However, the relevant question before the Ninth Circuit in *Rodriguez-*

27   *Camacho*, was entirely different from the question at issue in the instant case.  There, defendants

28   argued "that Congress may not constitutionally regulate the intrastate distribution of controlled

15

1  substances." 468 F.2d at 1221. In rejecting defendants' argument, the Ninth Circuit was

2  concerned with Congress's findings "as to the effect of intrastate activities in controlled

3  substances on interstate commerce." *Id.* The court held that it would not substitute its judgment

4  for Congress's findings that controlled substances generally, including marijuana, have a

5  "substantial and detrimental effect on the health and general welfare of the American people." *Id.*

6  at 1222 (internal quotation marks omitted). The court noted it was sufficient "that Congress had a

7  rational basis for making its findings." *Id.* The court did not consider any arguments regarding

8  Congress's findings under 21 U.S.C section 812(b)(1) supporting marijuana's inclusion under

9  Schedule I.

10      To read *Miroyan* so broadly as to preclude constitutional challenges to marijuana's

11  scheduling under any circumstances would be inconsistent with the Supreme Court's relatively

12  recent observation in *Raich*, "that evidence proffered by [defendants] . . . regarding the effective

13  medical uses for marijuana, if found credible after trial, would cast serious doubt on the accuracy

14  of the findings that require marijuana to be listed in Schedule I." 545 U.S. at 27 n.37.[5]

15      *Miroyan* does not stand for the broad, unbendable proposition that district courts

16  are foreclosed from hearing constitutional challenges to the classification of marijuana under the

17  CSA.

18  IV.    EVIDENTIARY HEARING AND RECORD BEFORE THE COURT

19      A.  Standards

20      A court may grant an evidentiary hearing where defendants "allege facts with

21  sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested

22  issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000); *see also United*

23

24  [5] *Raich* stands for much more than the limited observation cited here, but the fundamental
    questions *Raich* addressed are distinguishable from those presented here. In *Raich*, the
25  respondents' challenge was "quite limited": "they argue[d] that the CSA's categorical prohibition
    of the manufacture and possession of marijuana as applied to intrastate manufacture and
26  possession of marijuana for medical purposes pursuant to California law exceed[ed] Congress'
    authority under the Commerce Clause." 545 U.S. at 15. On this point, the Supreme Court held
27  "the regulation is squarely within Congress' commerce power . . . ." *Id.* at 19. In the instant case,
28  defendants do not challenge Congress's authority to legislate under the Commerce Clause.

1    *States v. Cano-Gomez*, 460 F. App'x 656, 657 (9th Cir. 2011) (unpublished) (reviewing denial of

2    evidentiary hearing on motion to dismiss).  A court's decision whether to conduct an evidentiary

3    hearing on a motion to dismiss an indictment is reviewed for an abuse of discretion.  *United*

4    *States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010).

5              Here, the court determined that defendants' moving papers set forth facts with

6    sufficient specificity, supported by declarations, showing there is new scientific and medical

7    information since marijuana's initial scheduling, raising contested issues of fact regarding

8    whether marijuana's continued inclusion as a Schedule I substance passes constitutional muster.

9    The court expressly limited the contours of the hearing to "prob[ing] the scientific and medical

10   information."  (Order, ECF No. 271 at 3.)

11             Defendants' request for an evidentiary hearing did not threaten to create a situation

12   where the court's ultimate determination on defendants' motion to dismiss would "invade the

13   province of the ultimate finder of fact."  *Schafer*, 625 F.3d at 635.  The factual assertions

14   defendants raised in the motion were not "intertwined with the 'general issue' to be decided at

15   trial."  *Id.* at 636.  Rather, defendants mounted a constitutional challenge against the statute under

16   which they were being prosecuted, raising an issue "segregable from the issue that was to be

17   decided at trial—[defendants'] guilt."  *Id.*

18        B.  Evidentiary Hearing Record

19             At the evidentiary hearing, the court heard live testimony from defense witnesses

20   Gregory T. Carter, M.D. (ECF No. 347), Carl L. Hart, Ph.D. (ECF No. 348), Philip A. Denney,

21   M.D. (*id.*), and marijuana cultivator and processor Christopher Conrad (ECF No. 349).  The

22   government's witness was Bertha K. Madras, Ph.D. (ECF No. 350).  While the hearing transcript

23   and documentary record speaks for itself, the court summarizes portions of testimony most

24   relevant here.

25             1.  Defense Experts

26             Dr. Carter is a medical doctor of almost thirty years, is board certified by several

27   medical associations, and is the co-author of a report regarding the cannabis plant's therapeutic

28   value, among other things.  (*See generally* Carter Decl., ECF No. 310.)  He, along with two other

1   authors, prepared the latter report at the request of the former Washington State Governor

2   Christine Gregoire (*Id.* ¶ 1), who "wanted to petition . . . to have cannabis rescheduled[]" (Carter

3   Test. 33:22–34:2, ECF No. 353).  Dr. Carter testified that "polls would show . . . the majority of

4   physicians . . . feel . . . cannabis has medical benefit."  (Carter Test. 95:13–14.)  He conceded that

5   other qualified individuals, including Dr. Madras, disagree with his opinion that marijuana has a

6   currently accepted use.  (*Id.* 38:8–23.)  Dr. Carter agreed that the position of the American

7   Medical Association (*id.* 38:24–41:5), the National Institute on Drug Abuse (*id.* 42:2–24), and the

8   Institute of Medicine (*id.* 42:25–43:21) on the medical benefits of marijuana is that it "might have

9   efficacy," but not that it certainly has.  Dr. Carter conceded that marijuana can change the brain

10  "physically and functionally."  (*Id.* 102:5–11.)  In addition, he testified that the Diagnostic and

11  Statistical Manual of Mental Disorders (DSM) -V and DSM-IV, authoritative references on

12  mental disorders, recognize cannabis use disorder.

13          Dr. Carter has advocated for reclassifying marijuana as a Schedule II substance.

14  (*Id.* 72:3–74:16.)  The latter part of Dr. Carter's testimony is important because the first criterion

15  under both Schedule I and II is the same: "[t]he drug or other substance has a high potential for

16  abuse."  21 U.S.C. § 812(b)(1)(A), (b)(2)(A).  When asked on redirect whether marijuana had a

17  high potential for abuse, he responded, "moderate." (Carter Test. 85:17–25.)  Dr. Carter was

18  adamant in his opinion, based on research with human subjects, "that marijuana has a tremendous

19  potential" in treating patients suffering from Amyotrophic Lateral Sclerosis ("ALS").  (Carter

20  Decl. ¶ 17, ECF No. 310.)

21          Dr. Carter acknowledged that the chemistry of "whole plant" marijuana is

22  "complex," with a hundred components classified as cannabinoids, and another two to three

23  hundred components that are "mostly terpenoids."  (Carter Test. 51-52.)   He opined that there is

24  a "fairly good understanding" of cannabinoids, with "more to be known" about the other

25  components.  *Id.*

26          According to Dr. Carter, there exists a "Catch-22" that prevents the development

27  of medical information demonstrating conclusively marijuana's medical value: "[It is] very

28  /////

1   difficult to do research in this area" because researchers cannot get funding and they cannot get

2   funding because marijuana is a Schedule I substance.  (*See* Carter Test. 82:15–23, 99:14–100:18.)

3          Dr. Carl Hart is an associate professor in the psychiatry department at Columbia

4   University, with a Ph.D in psychology and neuroscience, among other credentials.  (Hart Decl. at

5   1, ECF No. 313.)  His laboratory at Columbia is authorized by the Drug Enforcement Agency

6   (DEA) to administer controlled substances to human subjects for scientific studies, with the result

7   that Dr. Hart has been able to study marijuana's effects "utilizing the scientific methodology

8   which best predicts causation, rather than association, in human subjects."  (*Id.* at 5.)  Along with

9   others, Dr. Hart has received grants for more than $10 million from private and public entities

10  which have funded research projects "focused on substance abuse or the effects of specified

11  controlled substances in a controlled setting, including but not limited to drug effects in the

12  workplace, and the effect of THC and Marijuana on HIV-positive persons."  (*Id.* at 2.)

13         Dr. Hart has a unique first-hand perspective informed by the fact that his

14  laboratory is "one of the few laboratories in the Nation to have federal permission to conduct

15  clinical trials . . . and[,] therefore, [he] [has] personally observed human subjects under the

16  influence of illegal substances for lawful research purposes."  (*Id.* ¶ 2.)  Dr. Hart testified that he

17  was "in the majority" of qualified people who have concluded marijuana has medical use.  (*See*

18  Hart Test. 168:21–171:12, ECF No. 364.)  He testified specifically that a number of studies on

19  clinical populations show marijuana has a benefit for HIV-positive patients: [S]moking marijuana

20  increases food intake in HIV-positive people to the same extent as . . . Marinol."  (*Id.* 138:13–22.)

21  In addition, Dr. Hart opined there is "growing evidence that marijuana might be useful in post-

22  traumatic stress syndrome."  (*Id.* 167:10–20.)  To counter the harmful effects of smoking

23  marijuana, patients can use vaporizers.  (*Id.* 180:17–182:8.)  As to the potential negative effects of

24  smoking marijuana, Dr. Hart agreed "that any psychoactive drug has potential negative effects, as

25  well as potential positive effects."  (*Id.* 187:21–24.)  But one "must weigh the risk-benefit ratio to

26  determine whether or not . . . that drug should be used [as medicine]."  (*Id.*)  "[W]ith marijuana,"

27  "the potential benefits outweigh the potential risk."  (*Id.* 258:5–7.)  To illustrate the latter

28  conclusion, Dr. Hart provided an example of someone suffering from multiple sclerosis who

19

experiences symptom relief from using marijuana, and reasoned that because "the benefits of . . . symptom relief from multiple sclerosis outweigh [the] negatives[,]" that person should be able to use marijuana as medicine.  (*Id.* 277:19–23.)  In response to the government's question whether he agreed "heavy marijuana use resulted in a decrease in IQ when tracked from youth to midlife[]" (*id*. 223:6–9), Dr. Hart noted the users' IQs "remained within the normal range of functioning[]" (*id*. 16–20).

Dr. Hart confirmed, as suggested by Dr. Carter, that research into the medical benefits of marijuana is somewhat limited by the need to obtain the approvals that he has received, and that there is only one approved supplier of marijuana for research purposes, the University of Mississippi. (*Id*. 241-242, 246, 249-250.)

Dr. Denney, a California licensed physician of approximately forty years, has been involved "in the emerging field of cannabis medicine since 1999 . . . ."  (ECF No. 312 at 1.) During his private practice, he operated clinics in several locations throughout California. (Denney Test. 301:24–302:6, ECF No. 364.)  In the Redding office, Dr. Denney saw between twenty and twenty-five patients a day, "seeking medical marijuana recommendations[.]"  (*Id.* 319:17–21.)  Towards the end of his practice, which he closed in 2010, Dr. Denney had made approximately 12,000 marijuana recommendations.  (*Id.* 375:11–377:2, ECF No. 365.)  His testimony was consistent with that of Drs. Hart and Carter, that there is a minority view holding marijuana had no medical use.  (*See id*. 419:10–420:9.)  While Dr. Denney personally "disagree[d] with the material in DSM-[V] related to marijuana[,]" he agreed that "there is lots of room for dispute . . . and divergence of opinions."  (*Id.* 528:17–529:16.)

Christopher Conrad, experienced in the legal cultivation and processing of marijuana, has "qualified as an expert witness on marijuana related issues such as cultivation, consumption, genetics, cloning, crop yields, medical use, recreational use, commercial sales, and medical distribution" in several counties, states, and countries.  (Conrad Decl. at 1, ECF No. 311.) The essence of his testimony is that the marijuana plant's chemistry is "known and reproducible." (*Id*. ¶ 1.)  Mr. Conrad testified the marijuana plant "is the most studied plant in the history of the world[.]"  (*Id*. 586:14–20.)  That the marijuana plant's chemistry is reproducible is important, he

1    says, because among other things it will allow the determination of whether there are any

2    contaminants in the plant.  (Conrad Test. 538:4–12, ECF No. 365.)  That, in turn, is important for

3    controlling the marijuana plant's quality.  (*Id*. 538:7.)

4            2.    Government Expert

5            The government's witness, Dr. Madras, is a professor of psychobiology at Harvard

6    Medical School.  (Madras Decl. ¶ 1, ECF No. 324.)  In addition to her substantial academic and

7    professional work, Dr. Madras has served as Deputy Director for Demand Reduction for the

8    White House Office of National Drug Control Policy, where she served from 2005 to 2008.  (*Id.*

9    ¶ 6.)  Dr. Madras has provided testimony to legislative bodies on proposed medical marijuana

10   bills and has made presentations for government agencies internationally.  (*Id.* ¶ 8.)  She has not

11   conducted studies with marijuana on human subjects.  (*Id*. 754-755, 827.)  She opined "that the

12   science strongly supports a conclusion that marijuana has a high potential for abuse, has no

13   currently accepted medical use in the United States, and that sufficient assurances of safety for

14   use of marijuana under medical supervision are lacking."  (*Id.* ¶ 13.)  She further stated that "[a]

15   substantial majority—perhaps the vast majority—of scientists familiar with the literature and

16   research agree that, at this time, marijuana does not have medical application."  (*Id.* ¶ 56.)  Dr.

17   Madras testified that any clinical trials involving smoking as the method of administration will

18   never be accepted as a basis for finding medical benefit.  (Madras Test. 652:19–653:5, ECF No.

19   366.)

20           At the same time, Dr. Madras agreed that the components of marijuana, known as

21   cannabinoids, "should be evaluated because there is tantalizing evidence in the literature that they

22   may have therapeutic benefit."  (*Id.* 689:6–8.)  She further agreed that "[t]here is tantalizing good

23   evidence that they do have a medical benefit."  (*Id.* 689:19–20.)

24           On the question of risk-benefit analysis, Dr. Madras disagreed with the defense

25   witnesses; she testified "the risks involved in the cannabis plant outweigh the benefits for the

26   medical use[.]"  (*Id.* 725:8–11.)  Furthermore, as to IQ changes in early marijuana users, unlike

27   Dr. Hart, Dr. Madras testified that she believes the documented drop in IQs is significant because

28   it takes adolescents from average to below average.  (*Id*. 821:21–822:14, ECF No. 367.)  Finally,

as to the Schedule I criteria – whether marijuana has currently-accepted medical use, whether it

has a high potential for abuse, and whether it can be administered safely under a physician's care

– Dr. Madras concluded that while "reasonable people could make the opposite conclusion" that

all those three factors are met, "there would have to be a denial of some evidence" to reach that

conclusion.  (*Id.* 822:15-823:10.)

### 3. Percipient Witnesses

The court also received evidence in documentary form, including declarations by

Sergeant Ryan D. Begin (ECF No. 309) and Jennie Stormes (ECF No. 315).  The court accepted

"their declaration testimony as percipient witnesses about their use of marijuana for medicinal

purposes."  (ECF No. 342 at 2–3.)  As the government chose not to cross-examine either witness,

they did not appear at the hearing to testify.  (*Id.* at 3.)  Sgt. Begin served in the U.S. Marine

Corps from 2001 to 2007.  (Begin Decl. ¶ 1, ECF No. 309.)  During his second deployment to

Iraq in 2004, he was severely injured, resulting in having over thirty-five surgeries on his right

elbow.  (*Id.* ¶¶ 2–5.)  He is unable to bend his right arm and suffers constant pain.  (*Id.* ¶ 5.)

Sgt. Begin has been diagnosed with posttraumatic stress syndrome (PTSD).  (*Id.* ¶ 6.)  Sgt. Begin

started using medical cannabis in 2009 and noticed that cannabis made him "feel more

emotionally stable and also helped [him] to appropriately manage the pain in his elbow . . . ."  (*Id.*

¶ 7.)  Eventually, "with the brutal pain in [his] right arm, [he] began consuming a greater quantity

of cannabis . . . ."  (*Id.* ¶ 10.)  As a result, he "started feeling noticeably more mentally and

emotionally healthy than [he] had since before [his] deployments[]" and "[t]he pain in [his] elbow

became manageable . . . ."  (*Id.*)

Jennie Stormes is a nurse and mother of two, one of whom, her fifteen year old

son, suffers from Dravet Syndrome.  (Stormes Decl. ¶ 2, ECF No. 315; Supplemental Stormes

Decl. ¶ 1, ECF No. 368-1.)  Dravet Syndrome is a rare form of epilepsy.  (*Id.* ¶ 4.)  *See Snyder v.*

*Sec'y of Health & Human Servs.*, 553 F. App'x 994, 996 (Fed. Cir. 2014) ("Dravet Syndrome is a

rare disorder that is characterized by generalized tonic, clonic, and tonic-clonic seizures,[6] which

---

[6] Tonic seizures cause muscle stiffening.  *See Corzine v. Sec'y of Dep't of Health &*
*Human Servs.*, No. 01-230, 2004 WL 1047394, at *10 (Fed. Cl. Apr. 23, 2004).  Clonic seizures
cause rapid muscle contractions.  *See Jones v. Astrue*, No. 11-2217, 2012 WL 4959413, at *3 n.1

1    are typically induced by fever and begin during the first year of life.").  Stormes' observations of

2    her son's symptoms include, among other things, cognitive delays, language speech delays,

3    inability to recognize danger, and frequent seizures.  (ECF No. 315 ¶ 4.)  During his entire life, he

4    has been given approximately twenty different medications in approximately fifty different

5    combinations and has had several surgeries.  (*Id.* ¶¶ 7–9.)  In 2012, he began using medical

6    cannabis (*id.* ¶ 9) and, "[a]lmost immediately[,] he came out of fog[;] . . . was more open and

7    alert[;] and began to show signs of cognitive improvements, lessened seizure intensity and

8    quicker recovery from seizure events."  (*Id.* ¶ 10.)  Furthermore, he "is less hyperactive[] and

9    exhibits fewer self destructive [sic] tendencies."  (*Id.* ¶ 12.)

10   V.      DISCUSSION

11           A.      Equal Protection: Classification of Marijuana

12                   1.  Standard of Review

13                   In determining whether a regulation violates the equal protection clause of the

14   Fifth Amendment, courts first determine the level of scrutiny to apply.  *Kahawaiolaa v. Norton*,

15   386 F.3d 1271, 1277 (9th Cir. 2004).  Laws alleged to violate the Equal Protection Clause are

16   subject to one of three levels of scrutiny: (1) strict scrutiny, (2) intermediate scrutiny, or

17   (3) rational basis review.  *Id.* Here, while the court previously has signaled its tentative view that

18   rational basis scrutiny applied in this case, the court left open ultimate determination of the

19   applicable level of scrutiny, allowing development of the record to ensure its decision fit the facts

20   of this case.  (ECF No. 295 at 7–8.)

21                   Strict scrutiny applies when a classification is made on suspect grounds, such as

22   race or ancestry, or if the classification infringes on a fundamental right, such as privacy,

23   marriage, voting, travel, or freedom to associate.  *Kahawaiolaa*, 386 F.3d at 1277.  Intermediate

24   scrutiny applies, on the other hand, when a law discriminates based on a quasi-suspect

25   classification.  *Id.*  Classifications based on sex and legitimacy, as well as children of

26   undocumented aliens denied public education, have been reviewed under intermediate scrutiny.

27   (W.D. Ark. Oct. 17, 2012).  Typically the two occur together, and are referred to as tonic-clonic
     seizures, which formerly have been known as grand mal seizures.  *See id.*

28

23

1   *See United States v. Virginia*, 518 U.S. 515 (1996) (sex): *Lehr v. Robertson*, 463 U.S. 248 (1983)

2   (legitimacy); *Plyler v. Doe*, 457 U.S. 202 (1982) (children of undocumented aliens).  When no

3   suspect or quasi-suspect class is involved and no fundamental right is burdened, courts apply a

4   rational basis test to determine the legitimacy of the classification.  *Id. at* 1277–78.

5   　　　　　Defendants contend that strict scrutiny should apply to their equal protection claim

6   because it implicates a fundamental right: "the right to be free from incarceration."  (ECF

7   No. 199-1 at 10.)  Defendants also contend that the treatment of marijuana as a Schedule I

8   controlled substance targets a suspect class.  (*Id.* at 10–11 n.16.)  They also argue, in the

9   alternative, for heightened rational basis review.  (*Id.* at 11–12.)  Finally, defendants argue they

10  prevail even under traditional rational basis review.  (*Id.* at 12–28.)

11  　　　　　　　　　a.　　　Fundamental Right

12  　　　　　Defendants argue that strict scrutiny is warranted because their fundamental right

13  to liberty is at stake.  (*Id.* at 9–10.)  The government agrees "[d]efendants enjoy a fundamental

14  right to liberty," but  argues the statute at issue "does not encroach on that liberty interest."  (ECF

15  No. 279 at 14.)

16  　　　　　"Every person has a fundamental right to liberty in the sense that the government

17  may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal

18  trial conducted in accordance with the relevant constitutional guarantees."  *Chapman v. United*

19  *States*, 500 U.S. 453, 465 (1991).  But substantive due process requires a "careful description of

20  the asserted fundamental liberty interest."  *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

21  *Glucksberg* teaches that courts must adopt a narrow definition of the interest at stake.  *Id.* at 722.

22  Hence, the right asserted in this case cannot be the broad fundamental liberty interest defendants

23  claim.  *See United States v. Greene*, 892 F.2d 453, 456 (6th Cir. 1989) (the present classification

24  of marijuana does not affect fundamental rights); *see also Raich v. Gonzales*, 500 F.3d 850, 866

25  (9th Cir. 2007) (there is no fundamental right to use medical marijuana); *Kuromiya v. United*

26  *States*, 37 F. Supp. 2d 717, 727 (E.D. Pa. 1999) ("[T]here is no fundamental right to use

27  marijuana in any context . . . .").  The court is unpersuaded by defendants' argument that a

28  fundamental right is implicated by the CSA's scheduling of marijuana.  *See Fogarty*, 692 F.2d at

1    547 ("Because there is no fundamental constitutional right to import, sell, or possess marijuana,

2    the legislative classification complained of . . . must be upheld unless it bears no rational

3    relationship to a legitimate government purpose.").

4                              b.      Suspect Classification

5                    Because the CSA is neutral on its face, to trigger strict scrutiny defendants must

6    prove the following two elements of a prima facie case: (1) the law has a disparate impact on a

7    particular group, and (2) the impact on this group is intentional in the sense that it results from a

8    discriminatory purpose or design.  *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256,

9    272 (1979); *United States v. Dumas*, 64 F.3d 1427, 1429–31 (9th Cir. 1995) (citing *Feeney*,

10   442 U.S. at 272, 279); *United States v. Coleman*, 24 F.3d 37, 38–39 (9th Cir. 1994) (same).  To

11   show a disparate impact, defendants must show that the law's practical effect is to burden one

12   group of persons more heavily than others.  *See Feeney*, 442 U.S. at 272–77.  To show

13   discriminatory purpose, defendants must show that discriminatory purpose was a motivating

14   factor in the decision to enact the particular law.  That is, the law must have been adopted "at

15   least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

16   *Id.* at 279.  The discriminatory purpose element can be proven in a number of ways, among other

17   things, by (1) legislative history; (2) the manner of adoption; (3) inferring intent from application;

18   or (4) other circumstantial evidence.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

19   429 U.S. 252, 265–69 (1977).

20                   Defendants argue they have established discriminatory purpose on Congress's part

21   based on certain offensive statements allegedly made at some point by Harry Anslinger, former

22   Commissioner of the Federal Bureau of Narcotics.  (ECF No. 199-1 at 10–11 n.16.)

23   Mr. Anslinger's statements, made to Congress in 1937 at the time the Marijuana Tax Act[7] was

24   _____

25              [7] The Marijuana Tax Act was passed in 1937.  *See* ch. 553, Publ. L. No. 75-238, 50 Stat.
     551 (1937).  It had two main subparts: the first imposed a tax on transfers of marijuana, and the
26   second imposed an occupational tax upon those who dealt in marijuana.  *Leary v. United States,*
     395 U.S. 6, 14 (1969).  The Marijuana Tax Act remained in effect until challenged and
27   overturned in *Leary*.  *Id.*  It was the following year, in reaction to the *Leary* decision, that
     Congress enacted the CSA.  *See, e.g.,* Ronald Timothy Fletcher*, The Medical Necessity Defense
28   and De Minimis Protection for Patients Who Would Benefit from Using Marijuana for Medical*

1    passed, painted a picture of marijuana users as mainly racial minorities.  (ECF No. 199-3 at 3.)

2    Defendants do not assert that Congress relied on those statements when it enacted the CSA thirty-

3    three years later, or that Anslinger was part of any body whose decisions lay the groundwork for

4    the CSA's enactment.  Anslinger's statements cannot form the basis for a discriminatory purpose

5    claim.  *Cf. Vill. of Arlington Heights*, 429 U.S. at 268 ("The legislative or administrative history

6    may be highly relevant, especially where there are contemporary statements by members of the

7    decisionmaking body, minutes of its meetings, or reports.").  Because defendants ask the court to

8    "ascribe a discriminatory intent to Congress based on rather sketchy and unpersuasive bits of

9    information," *United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994), the court cannot find

10   Congress acted with a discriminatory purpose in designating marijuana as a Schedule I substance

11   under the CSA.  Defendants are not entitled to strict scrutiny on the basis of a suspect class.  *See*

12   *United States v. Heying* (*Heying II*), No. 14-30, 2014 WL 5286155 at *4 (D. Minn. Oct. 15,

13   2014).

14                          c.       Rational Basis

15              If a law does not involve a suspect or quasi-suspect classification and does not

16   discriminate with respect to a fundamental right, courts apply a rational basis test to decide

17   whether the law violates the equal protection clause.  *See Heller v. Doe by Doe*, 509 U.S. 312,

18   319 (1993) ("[A] classification neither involving fundamental rights nor proceeding along suspect

19   lines is accorded a strong presumption of validity."); *United States v. Hancock*, 231 F.3d 557,

20   565–66 (9th Cir. 2000) (citing *Heller*, 509 U.S. at 319).  This is a very deferential standard and

21   precludes judges from second-guessing Congress's "wisdom, fairness, or logic of legislative

22   choices."  *Heller*, 509 U.S. at 319 (internal quotation marks omitted).  Rather, courts must uphold

23   a classification against an equal protection challenge so long as any reasonably conceivable facts

24   might provide a rational basis for the classification.  *Id.* at 320 (internal quotation marks omitted).

25   Courts must accept Congress's generalizations even when means and ends do not fit perfectly

26   together.  A classification will not fail rational-basis review even if "it is not made with

27   _____

28   *Purposes: A Proposal to Establish Comprehensive Protection Under Federal Drug Laws*, 37 Val.
     U. L. Rev. 983, 994–95 (2003).

1  mathematical nicety or because in practice it results in some inequality." *Id.* at 321 (internal

2  quotation marks omitted).  "The problems of government are practical ones and may justify, if

3  they do not require, rough accommodations—illogical, it may be, and unscientific." *Id.* (internal

4  quotation marks omitted).  However, "even the standard of rationality . . . must find some footing

5  in the realities of the subject addressed by the legislation." *Id.*

6        There are two versions of the rational basis test, traditional rational basis review

7  and a more rigorous rational basis review.  *See Wilde*, 2014 WL 6469024, at *3 (citing Erwin

8  Chemerinsky, *Constitutional Law: Principles and Policies*, 680 (3d ed. 2006)); *Dairy v. Bonham*,

9  No. 13-1518, 2013 WL 3829268, at *5 n.4 (N.D. Cal. July 23, 2013) (collecting authorities).  The

10  more rigorous standard "'(sometimes referred to as 'rational basis with a bite') has been applied

11  in other situations such as where important but not fundamental rights or sensitive but not suspect

12  classifications are involved." *Id.*  "A common thread runs through nearly all of the Supreme

13  Court cases where active rational basis review was employed to determine the constitutionality of

14  a legislative enactment.  Namely, these cases involve situations where a legislative classification

15  appears to have been based on animus or a desire to harm a politically unpopular group." *Wilde*,

16  2014 WL 6469024, at *3 (collecting cases).

17        Here, defendants have not submitted any evidence that Congress classified

18  marijuana as a Schedule I controlled substance because of animus or some discriminatory

19  legislative purpose.  Nor is there any evidence that defendants are members of a politically

20  unpopular group targeted by the CSA.  There is no justification for applying a more rigorous

21  version of rational basis review in this case.

22        Under the deferential standard of rational basis review, then, as long as there is

23  some conceivable reason for the challenged classification of marijuana, the CSA should be

24  upheld.  Such a classification comes before the court "bearing a strong presumption of validity,"

25  and the challenger must "negative every conceivable basis which might support it . . . ." *F.C.C. v.*

26  *Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (internal quotation marks omitted).  The

27  asserted rationale may rest on "rational speculation unsupported by evidence or empirical data."

28  *Id.* at 315.  The law may be overinclusive, underinclusive, illogical, and unscientific and yet pass

27

1    constitutional muster.  In addition, under rational basis review, the government "has no obligation

2    to produce evidence to sustain the rationality of a statutory classification."  *Heller*, 509 U.S. at

3    320.

4                   Courts that have considered the constitutional question at issue in this case have

5    consistently applied rational basis review.  *See, e.g.*, *Miroyan*, 577 F.2d at 495; *United States v.*

6    *Oakland Cannabis Buyers' Co-op*, 259 F. App'x 936, 938 (9th Cir. 2007) (unpublished) ("The

7    district court properly concluded that the placement of marijuana in Schedule I of the Controlled

8    Substances Act satisfies rational basis review."); *United States v. White Plume*, 447 F.3d 1067,

9    1076 (8th Cir. 2006) ("[C]ategorizing marijuana . . . as a Schedule I substance passes muster

10   under the rational basis test . . ."); *United States v. Washington*, 887 F. Supp. 2d 1077, 1102 (D.

11   Mont. 2012) (applying rational basis review); *United States v. McFarland*, No. 12-40082-02,

12   2012 WL 5864008, at *1 (D.S.D. Nov. 19, 2012) (same); *United States v. Zhuta*, No. 09-357,

13   2010 WL 5636212, at *4 (W.D.N.Y. Oct. 29, 2010) ("[E]ven assuming, arguendo, that marijuana

14   has some currently accepted medical uses, the Schedule I classification may nevertheless be

15   rational in view of countervailing factors such as the current pattern, scope, and significance of

16   marijuana abuse and the risk it poses to public health." (internal citation omitted)).  Given the

17   circumstances of this case, this court follows suit.

18          2.  Analysis

19                  In light of the foregoing, the question before the court is a narrow one: whether

20   Congress acted rationally in classifying marijuana as a Schedule I substance in light of the record

21   created before this court.  To ask that question in this case, under rational basis review, is to

22   answer it.  This court cannot say that Congress could not reasonably have decided that marijuana

23   belongs and continues to belong on Schedule I of the CSA.  As explained below, the record here

24   does not demonstrate there is only one supportable point of view about marijuana's safe, medical

25   value or abuse potential.

26   /////

27   /////

28   /////

As noted above, the statutory section in the CSA entitled "Placement on schedules; findings required," provides as follows, in relevant part:

> [A] drug or other substance may not be placed in any schedule unless the findings required for such schedule are made with respect to such drug or other substance.  The findings required for [Schedule I] are as follows:
>
> (1) Schedule I—
>
> (A) The drug or other substance has a high potential for abuse.
>
> (B) The drug or other substance has no currently accepted medical use in treatment in the United States.
>
> (C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

21 U.S.C. § 812(b).

Defendants claim that the weight of current medical knowledge shows marijuana does not satisfy these three criteria.  The Supreme Court has observed that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."  *United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938).  Here, the facts relating to the three criteria as applied to marijuana, on which Congress initially relied in 1970, have not been rendered obsolete however much they may be changed and changing.  Selected facts relevant to each criterion illustrate this point, as reviewed below.

a.      High Potential for Abuse

As shown from the evidence in the record, there are conflicts in testimony and material disagreements as to whether marijuana has a high potential for abuse.  For example, Dr. Carter testified that he advocated for reclassifying marijuana as a Schedule II substance.  (Carter Test. 72:3–73:10, ECF No. 353.)  That testimony is important because the first criterion under both Schedule I and II is the same: "[t]he drug or other substance has a high potential for abuse." 21 U.S.C. § 812(b)(1)(A), (b)(2)(A).  On redirect, however, he testified marijuana's potential for abuse was "moderate." (Carter Test. 85:17–25.)  Dr. Madras, on the other hand, was adamant in

1   her opinion that marijuana has a high potential for abuse:  "[T]here is no question that extensive

2   data and practical experience support the conclusion that marijuana has a high potential for abuse,

3   and is actually abused."  (Madras Decl. at 9–10, ECF No. 374; *see also* Madras Test. 745:20–25,

4   ECF No. 367.)  Congress could rationally find marijuana has a high potential for abuse.

5                                    b.    No Currently Accepted Medical Use

6           Similarly, the evidence shows that disagreements among well-informed experts as

7   to marijuana's medical use persist.  Dr. Carter testified that although he believes the majority of

8   physicians believe marijuana has medical benefit (Carter Test. 95:13–14, ECF No. 353), other

9   qualified professionals, including Dr. Madras, disagree with his opinion.  (*Id.* 38:8–23.)  Dr.

10  Hart's testimony was consistent with Dr. Carter's observation that he was "in the majority" of

11  qualified people who think marijuana has medical use.  (*See* Hart Test. 168:21–171:12, ECF No.

12  364.)  And Dr. Denney's testimony corroborated Drs. Hart's and Carter's testimony that there is a

13  recognized minority view holding marijuana had no medical use.  (*See* Denney Test. 419:10–

14  420:9, ECF No. 365.)

15          Dr. Madras, on the other hand, stated that "[a] substantial majority—perhaps the

16  vast majority—of scientists familiar with the literature and research" attest that, at this time,

17  marijuana has no confirmed medical application.  (Madras Decl. ¶ 56, ECF No. 324.)  She

18  conceded at most that cannabinoids, the components of marijuana, should be evaluated because

19  there is scientific evidence that they may have medical benefit.  (Madras Test. 689:6–8, ECF No.

20  366.)  Dr. Madras opined that while reasonable experts could find a way to conclude otherwise,

21  that whole plant marijuana is known to have medical value, they would be ignoring some of the

22  evidence to reach that conclusion.  (Id. 822:15–823:10, ECF No. 367.)

23          The Surgeon General's statements to a media outlet about marijuana's efficacy for

24  certain medical conditions and symptoms, of which the court has taken judicial notice, do not

25  eliminate the principled disagreements of the experts here.

26          Congress could rationally conclude that marijuana, the undifferentiated plant that

27  appears on Schedule I, has no established medical value.

28

1

2

          c.      Lack of Accepted Safety for Use of Marijuana under Medical Supervision

3          Finally, the evidence is conflicting as to whether there is accepted safety for

4  marijuana's use under medical supervision.

5          Dr. Hart, who has personally administered "thousands of doses of marijuana" to

6  human subjects, testified that marijuana's safe administration under medical supervision is

7  established.  (Hart Test. 165:16–166:2, ECF No. 364.)  Dr. Denney, who has recommended

8  marijuana to approximately 12,000 patients in California during his career (Denney Test. 375:11–

9  377:2, ECF No. 364), testified more generally that none of his patients ever reported major issues.

10  (*See Id.* 485:13–488:18.)

11          On the other hand, Dr. Madras reasoned marijuana cannot be used safely because,

12  among other things, there is no adequate understanding of its composition.  (Madras Dec. ¶ 63

13  ("There are simply too many variables to assure safety to potential patients at this time, and to

14  assure that drug-drug interactions will be harmless."), ECF No. 324.)  In addition, "in view of

15  marijuana's negative side-effects, one simply cannot be assured that marijuana can be safely used,

16  even under medical supervision, for long term open-ended use."  (*Id.* ¶ 66.)  Dr. Madras was not

17  aware, despite her thorough review of the literature, of any "recent study with a large cohort of

18  marijuana-naive subjects that would compel the conclusion that there is an acceptable level of

19  safety for use of marijuana under medical supervision."  (*Id.* ¶ 69.)  Dr. Madras concluded that

20  "adequate safety assurances for the use of marijuana, even under medical supervision, are

21  lacking."  (*Id.* ¶ 72.)

22          Congress could rationally conclude there is a lack of accepted safety for use of

23  marijuana under medical supervision.

24        3.   Conclusion

25          In sum, the evidence of record shows there are serious, principled differences

26  between and among prominent, well-informed, equivalently credible experts.  There are some

27  positive anecdotal reports from persons who have found relief from marijuana used for medical

28

1    purposes; those reports do not overcome the expert disputes.  Consistent with the conclusions

2    other courts have reached, this court finds "[t]he continuing questions about marijuana and its

3    effects make the classification rational." *NORML*, 488 F. Supp. at 136.

4                As another district court has observed,

5           [e]ven assuming, arguendo, that marijuana does not fall within a
            literal reading of Schedule I, the classification still is rational.
6           Placing marijuana in Schedule I furthered the regulatory purposes
            of Congress.  The statutory criteria of section 812(b)(1) are guides
7           in determining the schedule to which a drug belongs, but they are
            not dispositive. Indeed, the classifications at times cannot be
8           followed consistently, and some conflict exists as to the main factor
            in classifying a drug potential for abuse or possible medical use.
9    *Id. at* 140.

10               One is tempted to say, with apologies to Yogi Berra, it's "déjà vu all over again."

11   As the Second Circuit observed in 1973:  "It is apparently true that there is little or no basis for

12   concluding that marihuana is as dangerous a substance as some of the other drugs included in

13   Schedule I."  *Kiffer*, 477 F.2d at 356.  With the research that has been conducted since passage of

14   the CSA, the observation is just as true if not more so today.  But relative dangerousness is not the

15   test the court applies in resolving the constitutional question before it.

16               "In an equal protection case of this type . . . , those challenging the legislative

17   judgment must convince the court that the legislative facts on which the classification is

18   apparently based could not reasonably be conceived to be true by the governmental

19   decisionmaker."  *Vance v. Bradley*, 440 U.S. 93, 111 (1979).  Defendants, here, have not met

20   their "heavy burden of proving the irrationality of the Schedule I classification of marijuana,"

21   *Fogarty*, 692 F.2d at 547, because they have not negated "every conceivable basis which might

22   support it," *F.C.C.*, 508 U.S. at 315 (internal quotation marks omitted).  Even though the medical

23   landscape related to marijuana clearly has changed and is changing, "[w]hen Congress undertakes

24   to act in areas fraught with medical and scientific uncertainties, legislative options must be

25   especially broad and courts should be cautious not to rewrite legislation, even assuming,

26   arguendo, that judges with more direct exposure to the problem might make wiser choices."  *See*

27   *Marshall v. United States*, 414 U.S. 417, 427 (1974).  In view of the principled disagreements

28   among reputable scientists and practitioners regarding the potential benefits and detrimental

1    effects of marijuana, this court cannot say that its placement on Schedule I is so arbitrary or

2    unreasonable as to render it unconstitutional.  Congress still could rationally choose one side of

3    the debate over the other.

4            After careful consideration, the court joins the chorus of other courts considering

5    the same question, and concludes as have they that – assuming the record created here is

6    reflective of the best information currently available regarding marijuana - the issues raised by the

7    defense are policy issues for Congress to revisit if it chooses.  *See United States v. Canori*, 737

8    F.3d 181, 183 (2d Cir. 2013) ("We have previously upheld the constitutionality of Congress's

9    classification of marijuana as a Schedule I drug."); *White Plume*, 447 F.3d at 1075 ("[T]he

10   ongoing debate about the physical and psychological effects of marijuana and whether it had any

11   medicinal value was a sufficiently rational reason for Congress to include marijuana on Schedule

12   I."); *Fogarty*, 692 F.2d at 547–48 ("[T]he ongoing vigorous dispute as to the physical and

13   psychological effects of marijuana, its potential for abuse, and whether it has any medical value,

14   supports the rationality of the continued Schedule I classification."); *NORML*, 488 F. Supp. at 136

15   ("Given the continuing debate over marijuana, this court must defer to the legislature's judgments

16   on disputed factual issues."); *Kuromiya*, 37 F. Supp. 2d at 727 (finding "quarrels over the efficacy

17   and safety of marijuana . . . sufficient reason to hold that the prohibition on medical marijuana

18   was also rational").

19           B.   Equal Protection: Discriminatory Application of Federal Law

20           Defendants advance a second equal protection challenge, arguing "the policy

21   statement presented in the Memorandum to U.S. Attorneys from Deputy Attorney General James

22   Cole, issued on August 29, 2013 [(Cole Memorandum)], has resulted in a discriminatory

23   application of federal law . . . ."  (ECF No. 199-1 at 3 (citing Ex. A).)  The government counters

24   the Cole Memorandum does not advise prosecutors to make their decisions to prosecute or not

25   based on whether the state has legalized marijuana.  (ECF No. 224 at 12–14.)  Instead, the Cole

26   Memorandum advises prosecutors to follow the traditional approach, which relies on state and

27   local authorities to address lower-level or localized marijuana activity through enforcement of

28   their own narcotics laws.  (*Id.*)  The government argues the memorandum is intended solely as a

33

1   guide to the exercise of investigative and prosecutorial discretion and in no way alters the

2   Department of Justice's (DOJ) authority to enforce federal laws relating to marijuana, regardless

3   of state law.  (*Id.* at 16–17.)

4       "In our criminal justice system, the government retains 'broad discretion' as to

5   whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985).  "The conscious exercise

6   of some selectivity in enforcement is not in itself a federal constitutional violation."

7   *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (internal quotation marks omitted).  "[S]o long

8   as the prosecutor has probable cause to believe that the accused committed an offense defined by

9   statute, the decision whether or not to prosecute, and what charge to file or bring before a grand

10   jury, generally rests entirely in his [or her] discretion." *Id.*

11       As the Supreme Court has observed,

12   This broad discretion rests largely on the recognition that the
    decision to prosecute is particularly ill-suited to judicial review.
13   Such factors as the strength of the case, the prosecution's general
    deterrence value, the Government's enforcement priorities, and the
14   case's relationship to the Government's overall enforcement plan
    are not readily susceptible to the kind of analysis the courts are
15   competent to undertake.   Judicial supervision in this area,
    moreover, entails systemic costs of particular concern.  Examining
16   the basis of a prosecution delays the criminal proceeding, threatens
    to chill law enforcement by subjecting the prosecutor's motives and
17   decision-making to outside inquiry, and may undermine
    prosecutorial effectiveness by revealing the Government's
18   enforcement policy.  All these are substantial concerns that make
    the courts properly hesitant to examine the decision whether to
19   prosecute.

20   *Wayte*, 470 U.S. at 607–08.

21       Prosecutorial discretion, of course, is not boundless, and is "subject to

22   constitutional constraints." *Id.* at 608 (internal quotation marks omitted).  One such constraint is

23   the Equal Protection Clause:  The decision to prosecute may not be "deliberately based upon an

24   unjustifiable standard such as race, religion, or other arbitrary classification . . . ." *Id.* (internal

25   quotation marks omitted).  To show an unconstitutionally selective prosecution, a defendant must

26   carry the heavy burden of showing both discriminatory effect and purpose. *See id.* at 609.

27       Here, the court finds defendants have not met their burden of showing

28   discriminatory application of federal law.  In 2009, Deputy Attorney General Ogden issued a

1   memorandum (Ogden Memorandum), acknowledging that some states had authorized medical

2   use of marijuana and providing guidance to U.S. Attorneys concerning prosecutorial discretion in

3   those states in harmony with the DOJ's priorities.  *See Canori*, 737 F.3d at 183.  In 2011, the DOJ

4   issued a follow-up memorandum from Deputy Attorney General James M. Cole, which

5   reaffirmed the guidance issued in the Ogden Memo.  *Id.* at 184.  Subsequently, on August 29,

6   2013, the DOJ issued the memorandum at issue here, the second Cole Memorandum. (ECF

7   No. 199-1, Ex. A.)  The Cole Memorandum provides that it is "intended solely as a guide to the

8   exercise of investigative and prosecutorial discretion" and in no way alters the "authority to

9   enforce federal law, including federal laws relating to marijuana, regardless of state law." (*Id.*)

10  As another district court has noted: "[N]othing in the memorandum exempts from federal

11  prosecution those engaged in the distribution of marijuana in states where marijuana has been

12  legalized, nor does it exempt from prosecution those engaged in the distribution of marijuana in a

13  manner that is consistent with state law."  *Heying II*, 2014 WL 5286153, at *13.  Because the

14  memorandum does not treat individuals living in states where marijuana has been decriminalized

15  in whole or part differently from those who live in states where it has not, there is no violation of

16  defendants' equal protection rights.  *See Canori*, 737 F.3d at 185 (finding no "constitutional

17  crisis" created by the Ogden Memorandum, because marijuana remains illegal under federal law

18  regardless of state law).

19          Rather, the Cole Memorandum merely describes eight enforcement priorities to

20  guide the CSA's enforcement:  (1) "[p]reventing the distribution of marijuana to minors";

21  (2) "[p]reventing revenue from the sale of marijuana from going to criminal enterprises, gangs,

22  and cartels"; (3) "[p]reventing the diversion of marijuana from states where it is legal under state

23  law in some form to other states"; (4) "[p]reventing state-authorized marijuana activity from

24  being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity";

25  (5) "[p]reventing violence and the use of firearms in the cultivation and distribution of

26  marijuana"; (6) "[p]reventing drugged driving and the exacerbation of other adverse public health

27  consequences associated with marijuana use"; (7) "[p]reventing the growing of marijuana on

28  public lands and the attendant public safety and environmental dangers posed by marijuana

production on public lands"; and (8) "[p]reventing marijuana possession or use on federal property." (ECF No. 199-1 Ex. A at 1–2.) The priorities apply to "all federal enforcement activity . . . concerning marijuana in all states" and serve "as guidance . . . to focus . . . enforcement resources and efforts, including prosecution, on persons or organizations whose conduct interferes with any one or more of [the] priorities, regardless of state law." (*Id.*) As another district court has explained: "The establishment of these priorities and enforcement of the law in accordance therewith are entirely rational exercises of prosecutorial discretion." *Heying*, 2014 WL 5286153, at *15; *accord United States v. Firestack-Harvey*, No. cr-13-24-FVS, ECF No. 409 at 4–6 (E.D. Wash. June 24, 2014); *United States v. Taylor, et al.*, No. 1:14-cr-67, ECF No. 502 at 12–13 (W.D. Mich. Sept. 8, 2014). Defendants have not shown otherwise.

            C.      The Doctrine of Equal Sovereignty

            Each of the United States is "equal in power, dignity, and authority." *Shelby County, Ala. v. Holder*, 570 U.S.___, 133 S. Ct. 2612, 2623 (2013) (quoting *Coyle v. Smith*, 221 U.S. 559, 567 (1911)). This "equal sovereignty" is a "fundamental principle." *Id.* at 2622 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203–04 (2009)). When a law treats one state differently from another, the Supreme Court "requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Id.* (quoting *Nw. Austin*, 557 U.S. at 203–04). In *Shelby County*, the Supreme Court considered the disparate impact of section 4(b) of the Voting Rights Act of 1965. 133 S. Ct. at 2618. That section applied restrictions to only nine states and some additional counties. *Id.* at 2624. The Court found section 4(b) unconstitutional because the conditions that originally justified its passage no longer characterized voting in the covered states and counties. *Id.* at 2618.

            Defendants urge the court to rely on *Shelby County*, arguing the policy of the Cole Memorandum imposes a disparate impact on states in violation of the Tenth Amendment, akin to the burden section 4 of the Voting Rights Act placed in *Shelby County*. (ECF No. 199-1 at 31.) *Shelby County* does not fit squarely here. The Cole Memorandum is a very different creature from a statute. It does not circumscribe the DOJ's ability to prosecute drug offenses under the CSA in any state. (ECF No. 224 at 4.) It does not make production or distribution of marijuana

36

1    legal in any state, while burdening other states.  It is "intended solely as a guide" for prosecutors

2    in their exercise of discretion, *id.*, and federal prosecutors retain "exclusive authority and absolute

3    discretion to decide whether to prosecute a case," *Greenlaw v. United States*, 554 U.S. 237, 246

4    (2008) (internal quotation marks omitted).

5    　　　　　The CSA applies with equal force in states where marijuana is now legalized as a

6    matter of state law,[8] as it does in any other state where marijuana is criminalized both federally

7    and locally.  *See, e.g.*, *Wilde*, 2014 WL 6469024, at *5 (rejecting defendant's equal sovereignty

8    argument as applied to CSA because he had not shown "geographically disparate application of

9    the CSA, which is a fundamental prerequisite to any successful equal sovereignty challenge");

10   *accord Heying*, 2014 WL 5286153, at *15–17; *Firestack-Harvey*, No. cr-13-24-FVS, ECF No.

11   409 at 6–7; *Taylor*, No. 1:14-cr-67, ECF No. 502 at 14–15.

12   　　　　　Finally, defendants point to section 538 of the Consolidated and Further

13   Continuing Appropriations Act of 2015, H.R. 83, approved on December 16, 2014, and argue that

14   section 538 provides further support for their argument regarding disparate treatment of states:

15   Section 538 "specifically prohibits federal law from being applied equally in all jurisdictions by

16   cutting off funding for enforcement of marijuana laws in specified states, and the District of

17   Columbia."  (ECF No. 378 at 35-36.)

18   /////

19   /////

20   /////

21   　　　　[8]  In addition to the District of Columbia, as of the date of this order, it appears the court

22   could take judicial notice of the fact that at least twenty-four states have legalized marijuana in
     some form: Alaska, Arizona, California, Colorado, Connecticut, Delaware, Georgia, Hawaii,

23   Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New
     Hampshire, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and

24   Washington.  And in the following states, possession of marijuana has been decriminalized in
     some form: Mississippi, Nebraska, North Carolina, and Ohio.  *See, e.g.*, Office of National Drug

25   Control Policy, Marijuana Resource Center: State Laws Related to Marijuana (outdated; available

26   online at web address  https://www.whitehouse.gov/ondcp, last visited Apr. 17, 2015); Public
     Law No. 113-235 (Dec. 13, 2014) (listing states); *see also* Erica Orden, "Cuomo Signs Bill

27   Legalizing Medical Marijuana," *Wall Street Journal*, July 7, 2014 (available online); Greg
     Bluestein, "Medical Marijuana: Governor Signs Legalization Bill," *Atlanta Journal Constitution*,

28   Apr. 16, 2015, at B1.

1           H.R. 83 is a spending bill, effective only for the 2015 fiscal year.  *See* Public Law

2    No. 113-235.  It precludes the use of federal funds to prevent the states' adoption of medical

3    marijuana laws.  Specifically, section 538 provides as follows, in relevant part:

4        None of the funds made available in this Act to the Department of
         Justice may be used, with respect to the States of Alabama, Alaska,

5        Arizona, California, Colorado, Connecticut, Delaware, District of
         Columbia, Florida, Hawaii, Illinois, Iowa, Kentucky, Maine,

6        Maryland, Massachusetts, Michigan, Minnesota, Mississippi,
         Missouri, Montana, Nevada, New Hampshire, New Jersey, New

7        Mexico, Oregon, Rhode Island, South Carolina, Tennessee, Utah,
         Vermont, Washington, and Wisconsin, to prevent such States from

8        implementing their own State laws that authorize the use,
         distribution, possession, or cultivation of medical marijuana.

9

10   Pub. L. 113-235, 2014 H.R. 83 (Dec. 16, 2014) (Title V).

11          Defendants have not sought to amend their motion to rely expressly on section 538

12   and have not argued clearly that the language of section 538 alone provides an additional reason

13   for dismissal.  The court need not tease out all the implications of the appropriations language to

14   resolve the motion here.

15          Unlike the Voting Rights Act, the CSA does not preemptively limit a state's ability

16   to pass laws regarding marijuana or require a state to seek the DOJ's or the courts' permission

17   before doing so.  The defendants stringently assert that "the current burden of the [Cole

18   Memorandum's] disparate treatment is not justified by a current need." (ECF No. 199-1 at 32.)

19   Even if true, that does not grant this court authority to second-guess the DOJ's enforcement

20   policy or any guidance it provides to local U.S. Attorneys.

21   VI.    <u>CONCLUSION</u>

22          For the foregoing reasons, the court DENIES defendants' motion.

23          IT IS SO ORDERED.

24   DATED:  April 17, 2015.

25

26                                    _____

                                  UNITED STATES DISTRICT JUDGE

27

28